TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JASON C. PANG (Cal. Bar No. 296043)
Assistant United States Attorney
International Narcotics,
 Money Laundering, & Racketeering Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2652
     Facsimile: (213) 894-0141
     E-mail:   Jason.Pang@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

               UNITED STATES DISTRICT COURT

          FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 21-00008-CJC |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | Hearing Date: November 18, 2021 |
| | Hearing Time: 11:00 a.m. |
| HUGO SERGIO MEJIA, | Location:     Courtroom of the |
| | Hon. Cormac J. |
| Defendant. | Carney |

     Plaintiff United States of America, by and through its counsel

of record, the Acting United States Attorney for the Central District

of California and Assistant United States Attorney Jason C. Pang,

hereby files its Sentencing Position.

///

///

///

This Sentencing Position is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 25, 2021

Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


            /s/
JASON C. PANG
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.   INTRODUCTION

3    Defendant Hugo Sergio Mejia owned and operated an illegal

4 virtual-currency exchange business though shell companies, including

5 Worldwide Secure Communications, LLC, World Secure Data, The HODL

6 Group LLC, and HODL Group, LLC, to mask his activity for over two

7 years.  Despite being fully aware of the applicable law, including

8 that he needed to register his business with the Financial Crimes

9 Enforcement Network (FinCEN), defendant did not do so.  This is

10 because defendant used his business to launder what he knew and/or

11 believed to be proceeds of illegal activity, namely, drug

12 trafficking.  In total, the business generated transactions valued at

13 over $13,000,000 -- and up to $25,000,000.

14    The government seeks a sentence that sanctions defendant's

15 criminal behavior and sends a message of deterrence, but that also

16 reflects the mitigating circumstances present here.  The government

17 respectfully submits that a sentence of 46 months is appropriate,

18 just, and necessary to accomplish the goals set forth in 18 U.S.C. §

19 3553(a).

20

### II.   BACKGROUND ON CRYPTOCURRENCY MONEY LAUNDERING

21

#### A.   Unlicensed Money Transmitting Businesses

22    18 U.S.C. § 1960[1] criminalizes, in relevant part, money

23 transmitting businesses that fail to comply with federal registration

24 requirements, as required by 31 U.S.C. § 5330 and the regulations

25

26 _____

27    [1] On January 29, 2021, defendant pled guilty to a two-count
information, which charged defendant with violations of 18 U.S.C. §§
1960(a), (b)(1)(B) (Operating an Unlicensed Money Transmitting

28 Business) and 18 U.S.C. § 1956(a)(3)(B) (Laundering of Monetary
Instruments).

prescribed thereunder.  Section 1960 was enacted in 1992 as part of the Annunzio-Wylie Anti-Money Laundering Act, which was one of a series of provisions aimed at combating money laundering and enhancing reporting requirements relating to cash transactions.  A more complete explanation of the purpose of the legislation is in the report of the Senate Banking Committee on the bill in the prior session of Congress.  See S. Rep. No. 101-460, 101st Cong., 2d Sess. (1990).  That Senate Report noted that, as banks' compliance with money laundering legislation has improved, "[i]ncreasingly, money launderers are using money transmitters, check cashers, money exchanges and other nonbank financial companies" to "convert street currency into monetary instruments and even to transmit abroad the proceeds of drug sales."  Id. at 13-14.  "From its inception," Section 1960 "sought to prevent innovative ways of transmitting money illicitly."  United States v. Murgio, 209 F. Supp. 3d 698, 708 (S.D.N.Y. 2016) ("The legislative history of § 1960 supports the conclusion that bitcoins fall within the statute's purview").

A money transmitting business, like the one run through defendant's network of shell companies, must register with the federal government as a "money services business" ("MSB"), specifically, with FinCEN, which is part of the Department of Treasury.  31 C.F.R. § 1022.380(b)(2).  Registration as a MSB then triggers obligations for that business.  For example, under the Bank Secrecy Act, an MSB is required, among other things, generally to:

- Report transactions that the MSB knows, suspects, or has reason to suspect are suspicious (which includes funds derived from illegal activity or involves the use of the transmitter to facilitate criminal activity), if the

2

transactions are conducted or attempted by, at, or through the MSB, and the transactions involve or aggregate to at least $2,000 in funds or other assets (31 U.S.C. § 5318(g)(1); 31 C.F.R. §§ 1022.320(a)(2)); and

- File a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such MSB which involves a transaction in currency of more than $10,000 (31 C.F.R. § 1010.311).

In practice, the obligations outlined above require an MSB to verify customer identity, conduct due diligence on its customers, file reports with the federal government, and create and maintain records pursuant to the Bank Secrecy Act.  When MSBs are not registered with the federal government, they are not routinely subject to examinations (i.e., audits) conducted by FinCEN to ensure that these obligations are being followed, and have no incentive to comply with the requirements of the Bank Secrecy Act.  Unregistered MSBs thus operate in, and fuel, a black market financial system.

**B.    Background on Cryptocurrency and the Dark Web**

Digital currency (also known as crypto-currency or virtual currency) is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (i.e., currency created and regulated by a government).  Cryptocurrency exists entirely on the Internet and is not stored in any physical form. Cryptocurrency is not issued by any government, bank, or company and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.  Cryptocurrency is not illegal in the United States and may be used for legitimate financial transactions.  However, because of the "pseudonymous"

3

nature of cryptocurrency (described below), it is used for conducting illegal transactions, such as the sale of controlled substances.

"Bitcoin" (or "BTC") is a type of cryptocurrency that allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems.  Bitcoins are a decentralized form of cryptocurrency having no association with banks or governments.  Users store their Bitcoins in digital "wallets," which are identified by unique electronic "addresses."  A digital wallet essentially stores the access code that allows an individual to conduct Bitcoin transactions on the public ledger.  To access Bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key").  The public address can be analogized to an account number while the private key is like the password to access that account.  Even though the public addresses of those engaging in Bitcoin transactions are recorded on the public ledger, the "Blockchain," the true identities of the individuals or entities behind the public addresses are not recorded.  If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity.  Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.

Although legal and with legitimate use, Bitcoin is used by criminals for money-laundering purposes, and are believed to be the currency of choice for payment for illegal goods and services on "dark web" websites.  The "dark web" is a colloquial term for sophisticated, encrypted websites that allow participants to buy and sell illegal items, such as drugs, firearms, and other hazardous

4

1    materials (sold by "vendors") with greater anonymity than the

2    traditional Internet.  These online black market websites use a

3    variety of technologies, and other encryption technologies, to ensure

4    that communications and transactions are shielded from interception

5    and monitoring, and usually only accept digital currencies such as

6    Bitcoin as a form of payment for contraband.  A famous dark web

7    marketplace, Silk Road (which law enforcement shut down in 2013),

8    operated similar to legitimate commercial websites such as Amazon and

9    eBay, but offered drugs, guns, poisons, and other illicit goods and

10   services.

11        Generally, individuals can purchase or sell Bitcoin in a peer-

12   to-peer context (i.e., another individual willing to exchange Bitcoin

13   for cash) or from exchange companies.  Those offering to exchange

14   Bitcoin for cash in a peer-to-peer setting often advertise their

15   services on the Internet, on websites such as localbitcoins.com or

16   Craigslist.  Bitcoin exchangers either comply with the law, and

17   register with the government and implement anti money-laundering

18   controls (like traditional banks), or choose not to register with the

19   federal government, thereby seeking to avoid the requirements imposed

20   by the Bank Secrecy Act (described above).

21        In the government's experience with criminal investigations,

22   those who obtain and use digital currency via and through illicit

23   means seek to exchange this currency for fiat currency via

24   unregistered financial exchangers to remain outside government

25   scrutiny.  That is to say, illicit actors prefer exchanging their

26   Bitcoin for fiat currency (or vice versa) through institutions that

27   do not require a form of identification or report certain

28   transactions to the federal government.  This method of exchanging

1   allows illicit actors to exploit some of the features of

2   cryptocurrency and remain as anonymous as possible.

3   **III.  FACTUAL BACKGROUND**

4       Following law enforcement's identification and detection of

5   defendant's illegal virtual-currency exchange business on or around

6   early 2018, law enforcement conducted several controlled transactions

7   exceeding $250,000 through a confidential informant over course of

8   one year.[2]  For example, on August 22, 2019, the confidential

9   informant met with defendant to exchange approximately $50,000 worth

10  of Bitcoin for cash via defendant's virtual-currency exchange

11  business.  During that exchange, defendant told the confidential

12  informant that his virtual-currency exchange business did not require

13  customers to provide full information about themselves.  When the

14  confidential informant told defendant that the confidential informant

15  trafficked in methamphetamine, defendant responded that he had

16  another client who also sold drugs on the darknet.  Likewise, on

17  March 12, 2020, the confidential informant met with defendant to

18  exchange approximately $100,000 worth of Bitcoin for cash via

19  defendant's virtual-currency exchange business.  During that

20  exchange, the confidential informant again told defendant that he was

21  a drug trafficker who sold methamphetamine to sources in Australia.

22  Defendant discussed further facilitating what he believed to be the

23  confidential informant's global drug trafficking business by

24  conducting monthly exchanges going forward.  Defendant charged

25  commissions for these transactions, which constituted his profit for

26  serving as an exchanger.

27  ────────────

28      [2] These facts are taken from defendant's signed plea agreement
    (Dkt. 5).

1     In sum, despite being fully aware of the applicable law,
2  defendant did not register his business with FinCEN.  This is because
3  defendant ran his business to engage in financial transactions with
4  the intent to conceal the source of the property because he believed
5  them to be the proceeds of some form of unlawful activity, namely,
6  drug trafficking.

7  **IV.  APPLICABLE GUIDELINES RANGE**

8     The parties agree with USPO's total offense level calculation of
9  25, before any departures or variances, which follow the plea
10 agreement.  (Dkt. 5 at ¶17, Dkt. 27 at ¶¶5, 24-38.)  In addition, as
11 reflected by the plea agreement, the government believes that
12 defendant is entitled to an additional two-level downward variance
13 due to defendant's early acceptance of responsibility and the
14 unprecedented and unique circumstances involving the COVID-19
15 pandemic.  (Dkt. 5 at ¶6.)  Combined with a criminal history category
16 I, the resulting advisory guidelines range is 46 to 57 months.  The
17 U.S. Probation Office recommends a custodial sentence of 50 months,
18 followed by a three-year term of supervised release.  (Dkt. 26.)

19 **V.  DEFENDANT SHOULD BE SENTENCED TO 46 MONTHS' INCARCERATION**

20    The government submits that a 46-month sentence is appropriate
21 and just in light of the nature of the conduct, the need for specific
22 and general deterrence, and the characteristics of the defendant.
23 See 18 U.S.C. § 3553(a).

24    The nature of the underlying conduct is aggravating and warrants
25 a serious sanction.  Money laundering is a pernicious crime, as the
26 repatriation and concealment of illicit proceeds allows, and
27 incentivizes, criminal actors to profit and continue their activities
28 without disruption from the government.  Here, as he admitted in the

plea agreement, defendant knew about the applicable regulations
governing his money exchange business and purposefully flouted them.
That is because defendant structured his money exchange business with
the intent to establish an anonymous conduit for money laundering of
drug trafficking proceeds.

While the scope of criminal conduct that defendant enabled by
transacting business exceeding $13 million is unknown, the dangers
posed by his conduct are obvious and must be deterred.  The
recommended sentence is needed to ensure that defendant does not
resort to this activity again.  Further, the recommended sentence
will also send a message to the community at large -- particularly
those engaged in the business of cryptocurrency exchange.  Such a
sentence will send a signal that violations of the Bank Secrecy Act
are taken seriously.  In this case, defendant was not merely
willfully blind to the idea that criminals would use his business to
launder proceeds of drug trafficking; in fact, when told by a
customer (who was actually a confidential informant working with law
enforcement) that that the funds to be exchanged were proceeds of an
international drug trafficking business, defendant stated that he had
other drug trafficker clients and discussed conducting even more
cryptocurrency exchanges with the confidential informant on a monthly
basis.  This blatant conduct should be punished.  Imposing a sanction
on the cryptocurrency exchanger -- who serves as the sole gateway for
criminals who have illicit digital currency to get cash -- will
hopefully deter others to comply with AML laws.  That, in turn, will
hopefully also affect those who are committing the underlying
offenses generating illicit proceeds in the form of cryptocurrency.

8

While the government believes that a custodial sentence is necessary to reflect the goals of sanctioning criminal conduct and achieving deterrence, the mitigating factors here justify the government's requested sentence of 46 months -- lower than the U.S. Probation Office's recommended sentence.  First and foremost, defendant quickly accepted responsibility for his actions once the investigation into his business was made public.  This quick acceptance of responsibility during the COVID-19 era supports the government's request for a two-level downward variance, which is in addition to the standard three-level acceptance of responsibility decrease in total offense level.  Second, although this was a crime of opportunity, and not of necessity, defendant is a veteran of the United States army and received an honorable discharge from military service.  Third, the government also notes defendant's medical issues discussed in the PSR, which further justify the government's recommended sentence.

**VI.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 46 months' incarceration, to be followed by three years of supervised release.  The government also requests an order of forfeiture reflecting the currency and other property agreed to by the parties in paragraph 4 of the plea agreement.