1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE**

UNITED STATES OF AMERICA,          )
                                   )
                  Plaintiff,       )    **CERTIFIED TRANSCRIPT**
                                   )
        vs.                        )    Case No.
                                   )    8:21-cr-00008-CJC-1
HUGO SERGIO MEJIA,                 )
                                   )
                  Defendant.       )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SENTENCING

THURSDAY, NOVEMBER 18, 2021

11:08 A.M.

SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1            **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4            NICOLA T. HANNA
             United States Attorney
5            BY:  JASON C. PANG
                  Assistant United States Attorney
6            312 North Spring Street
             Suite 1200
7            Los Angeles, California 90012
             213-894-2652
8            Jason.pang@usdoj.gov

9    **FOR THE DEFENDANT:**

10           LAW OFFICES OF MICHAEL M. CRAIN
             MICHAEL M. CRAIN, ESQ.
11           PO Box 3730
             Santa Monica, California  90408
12           310-571-3324
             Michaelmcrain@aol.com

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1       **SANTA ANA, CALIFORNIA; THURSDAY, NOVEMBER 18, 2021**

2                 **11:08 A.M.**

3                  **- - -**

4

11:08AM  5       THE COURTROOM DEPUTY:  Calling Item Number 2,

6  SACR 21-00008-CJC, *United States of America vs. Hugo Sergio*

7  *Mejia.*

8        Counsel, please state your appearances for the

9  record.

11:08AM 10        MR. PANG:  Good morning, Your Honor.  Jason Pang on

11  behalf of the United States.

12        THE COURT:  Hello, Mr. Pang.

13        MR. CRAIN:  He took his mask off, so I took mine

14  off.  Is that okay?

11:08AM 15        THE COURT:  You know what, if you're more

16  comfortable speaking -- you can keep it off as long as you're

17  behind the plexiglass.  So you can either sit down, or you can

18  go to the lectern, whichever you're more comfortable with.

19        MR. CRAIN:  I'm Michael Crain on behalf of

11:08AM 20  Mr. Mejia, Your Honor.  Good morning.

21        THE COURT:  Okay.  We're here for the sentencing of

22  Mr. Mejia.

23        Mr. Mejia, before we get too far down the line, I

24  just want to make sure that you've had an opportunity to go

11:09AM 25  over the Presentence Investigation Report with Mr. Crain.

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Good.  What I'd like to do is give you

3     what I believe is the correct Sentencing Guideline range for

4     the case and then share with you some of the 3553 analysis I've

11:09AM  5    done, and then I want to give everyone an opportunity to be

6     heard, including anything that Mr. Mejia would like to say to

7     me as to the appropriate sentence in the case.

8          I used the November 1st, 2021 edition of the

9     Sentencing Guidelines, and I calculated the total offense level

11:09AM 10    at 25.  Let me tell you how I got there.  There was a base

11    offense level of 26 pursuant to Section 2S1.3(a)(2), and

12    Section 2B1.1(b)(1)(K).  I adopted the findings and analysis of

13    paragraphs 29 and 30 of the Presentence Investigation Report,

14    and I agree with the parties that 26 is the correct base

11:10AM 15    offense level because Mr. Mejia illegally exchanged over

16    $13 million but no more than $25 million.

17          Then I increased the offense level by two more

18    levels for proceeds of unlawful activity pursuant to

19    Section 2S1.3(b)(1)(A).  I adopted the findings and analysis of

11:10AM 20    paragraph 31 of the Presentence Investigation Report and agree

21    with the parties that this offense characteristic applies

22    because Mr. Mejia knew that some of the funds he was exchanging

23    was from the sale of narcotics.

24          Then, of course, I applied a downward adjustment of

11:10AM 25    three levels for Mr. Mejia's acceptance of responsibility, and

I agree with the parties and Probation that Mr. Mejia is entitled to the three-level reduction for his timely acceptance of responsibility in pleading guilty to the two-count Information.

Mr. Mejia has no scorable convictions; so his criminal history category is I.  And with an offense level of 25, criminal history category of I, the Sentencing Guideline range is 57 to 71 months in custody.

Mr. Mejia, you may recall from your change of plea, the Sentencing Guideline range is the starting point for my sentencing analysis.  Then I need to turn to the very important factors and objectives of sentencing under 18 U.S.C., Section 3553.  Under that statute, sir, I have to make sure that I've looked at the nature and circumstances of your offenses, your unique history and personal characteristics. And then I need to make sure that any sentence I impose will reflect the seriousness of the offenses, promote respect for the law, and provide just punishment; that the sentence will deter you and others from engaging in the criminal conduct; that the sentence will protect the public from any further crimes you might commit; that the sentence will provide you with needed educational or vocational training, medical care or other correctional treatment in the most effective manner; and that the sentence will avoid unwarranted sentencing disparities among people who have been similarly convicted and sentenced

1   for these types of offenses.

2         So with that, I identified one aggravating factor

3   and then several mitigating facts and circumstances that I

4   think offset that.

11:12AM 5         The aggravating factor is probably the obvious, is

6   that Mr. Mejia operated in illegal exchange over a two-year

7   period involving transactions totaling over $13 million.  And

8   some of those transactions involved laundered drug proceeds.

9         But there are several compelling mitigating facts

11:13AM 10  and circumstances.  First, I believe Mr. Mejia does come from

11   somewhat of a disadvantaged upbringing.  There was modest

12   financial means in the house.  He grew up in a very tough

13   neighborhood, in East Los Angeles, that had gangs and violence

14   including bullying.  His father did suffer from alcoholism and

11:13AM 15  that made it tough for him growing up as a young man.  And then

16   it was reported that as a toddler, he was abused sexually by --

17   I don't know if it was a family relative or a neighbor.

18         I did note in the record, too, that there is certain

19   substance abuse issues that Mr. Mejia has.  Sounds like he used

11:14AM 20  quite frequently marijuana.  And even marijuana, over a long

21   period of time, I do think it impacts your personality, your

22   judgment on what you get involved in and what you do.  Also, I

23   believe he has struggled with Xanax as well.

24         There are certain physical issues that Mr. Mejia has

11:14AM 25  that BOP needs to be -- make sure that they give him the proper

**UNITED STATES DISTRICT COURT**

1    treatment and care to deal with his diabetes, his high

2    cholesterol, and -- I'm not sure I'm going to pronounce this

3    correctly, but renopathy [sic] or --

4              MR. CRAIN:  I think it's retinopathy, Your Honor.

11:14AM 5         THE COURT:  Retinopathy.  Mr. Mejia also suffers

6    from depression and anxiety.

7              Another mitigating facts and circumstances, it's

8    going to be a hardship on his family, specifically his

9    75-year-old mom, which I understand Mr. Mejia provides

11:15AM 10   essential care to her.

11             I do want to recognize and commend Mr. Mejia for his

12   service in the Army.  He was honorably discharged.  And then I

13   also note that the Government itself is asking for a two-level

14   variance in this case, which I find to be reasonable, in light

11:15AM 15   of Mr. Mejia's early acceptance of responsibility pleading

16   guilty.  And with this COVID pandemic, we are in difficult

17   times, and the system is moving very slowly.  And, obviously,

18   Mr. Mejia is doing his part by agreeing at the time to appear

19   by video teleconferencing, and then just moving the cases in

11:16AM 20   our justice system.

21             Again, I haven't decided what the final sentence

22   should be in this case.  I know the Government, as I understand

23   it, is recommending 46 months; Probation, I believe, is around

24   46 or 50 months.  And I know the defense has a much different

11:16AM 25   view on what the appropriate sentence is.  So I'd like to hear

from everybody.  Why don't I hear from the Government first.

Mr. Pang, when you're ready, could you tell me my guideline analysis, whether it's correct, and then 3553 analysis and the ultimate sentence, sir.

11:16AM   MR. PANG:  Yes, Your Honor.

I think the parties agree with the Court's guideline analysis.  And, of course, the parties have stipulated to a two-level downward variance, which reflects Mr. Mejia -- the defendant's early acceptance of responsibility.  And as the Court noted, we're in very difficult times, and his early acceptance of responsibility was of great assistance to the legal system in general.  Cases were moving slowly.  Trials were being pushed off, and he was very accommodating in what he agreed to in his plea agreement.

I think it's important to note at kind of the threshold matter, and this should not be discounted, that Mr. Mejia accepted responsibility early on, and he's accepted responsibility throughout the course of the pendency of this case.  He has cooperated with the Government.  He has -- not in the traditional sense of earning credit, but he hasn't pushed back when we were negotiating about the total amount of loss that was involved in this case when he met with Pretrial Services.  It's my understanding that he cooperated fully.  He expressed remorse for his actions.  Those were all worthy things.

As the Court has done, I also have reviewed all of the letters and support to Mr. Mejia.  I think they're all worthwhile.  And as the Court noted, Mr. Mejia served his country well.  He was honorably discharged.  I think that's something that the Court needs to consider.

The Government's recommending a low-end sentence incorporating the two-level variance that the parties have agreed to because of the mitigating circumstances in this case.  That said, it appears that Mr. Mejia, through his counsel, is requesting a probation-level sentence, which would, in essence, be a 15-level downward departure from what the current guidelines are.  And I'll quickly go through the 3553 factors which would, in the Government's view, lean in favor of a custodial sentence.  Of course, the ultimate sentence is within the discretion of the Court.

First, the main issue here is this is not a crime of necessity; right?  This is a crime of opportunity.  Crypto laundering -- this -- a typical circumstance, crypto launderers work in the veil of willful blindness, we'll say.  They know that a drug trafficker is attempting to launder funds, and they'll turn a blind eye to the fact that they're converting cryptocurrency into real cash suspecting that either a confidential source or a known drug trafficker is attempting to convert funds.

This is a somewhat unusual case in that Mr. Mejia

1    wasn't just willfully blind, he was an active participant in

2    converting funds that he knew were proceeds of drug trafficking

3    into actual funds.  That's why he wasn't a registered

4    launderer.  It's not just that he knew that the funds were

11:19AM  5    converted from drug trafficking proceeds into cash, it's after

6    a series of transactions as laid out in the factual basis of

7    the Pretrial Services report at the very last instance, which I

8    believe was March or April of 2020, he affirmatively told the

9    confidential source after the confidential source had told

11:20AM 10    Mr. Mejia that his drug trafficking organization was

11    international in scope reaching to Australia that actually led

12    to schedule a series of transactions over the course of a

13    monthly basis.

14            And, of course, we don't know the full scope of the

11:20AM 15    drug trafficking activity that funded Mr. Mejia's between

16    13 million to $25 million in unregistered transactions.  But

17    given the admissions he made to the confidential source, we

18    suspect that they're significant.

19            So going to the 3553 factors, not only proper

11:20AM 20    respect for the law, but because this is a relatively new area

21    of money laundering that the Government is starting to

22    prosecute, we believe that general deterrence and unwarranted

23    disparities in this case require a custodial sentence.  That's

24    why the Government's recommending a 46-month sentence, which,

11:21AM 25    as the Court notes, incorporating the two-level variance is at

1    the low end of the Sentencing Guidelines.

2              THE COURT:  All right.  Mr. Crain.

3              MR. CRAIN:  Yes, Your Honor.  May I come up here?

4              THE COURT:  You may.

11:21AM 5        MR. CRAIN:  Thank you.

6              Your Honor, first of all, I appreciate the Court's

7    analysis of all -- of many, if not all, of the mitigating

8    factors.  And I appreciate Mr. Pang directing some of his

9    attention to that.

11:21AM 10             In addition, I'm not going to go through them again,

11   but the Court has pointed out the tough life that Mr. Mejia

12   has had in terms of growing up and his kindness and

13   charitability [sic] towards his mother, who is in the

14   courtroom, along with his fiancée and fiancée's mother.

11:22AM 15             He does suffer from depression and anxiety.  He has

16   had problems with Xanax and, also, with marijuana, which the

17   Court pointed out can, over long-term period, have adverse

18   effects on people's personalities.

19             The retinopathy that he has, the very serious

11:22AM 20   matter, he actually gets injections in his eyes on a regular

21   basis.  It's, like, every month.  And as I pointed out in the

22   sentencing position, he's diabetic and that has two

23   ramifications here.  One, the retinopathy for people who have

24   diabetes, such as Mr. Mejia, it can lead to blindness if

11:22AM 25   it's -- certainly if it's untreated and, in some cases, if it

```
  1   is treated.  So he's doing the best that he can in terms of

  2   going through these difficult and unpleasant and painful

  3   procedures in an attempt to prevent his eyesight from being

  4   lost totally.

11:23AM  5          Another factor with regard to the diabetes, the

  6   second one is -- I think I pointed out in the sentencing

  7   position -- is that people with diabetes are much more likely

  8   to be adversely affected if they contract COVID.  And people

  9   who have underlying conditions, even if vaccinated, are the

11:23AM 10   ones who are much more likely to suffer either ending up on a

 11   ventilator or dying.  And BOP put some statistics in there in

 12   terms of the BOP's number of COVID cases that they had at the

 13   time of the filing of the sentencing position, and it's

 14   actually quite shocking.

11:23AM 15          And another problem with the BOP, as evidence at the

 16   MDC, I think now because of the requirement by the Executive

 17   Branch, many, many staff members at the MDC -- and so I think

 18   this carries over to all facilities at the BOP -- many of them

 19   are unvaccinated.  They're either anti-vaxxers or they choose

11:24AM 20   not to be vaccinated for one reason or another.  And I think

 21   now maybe those are being shown the door by the Government who

 22   refuse to get vaccinated.

 23          But this is a problem to the extent that there are

 24   unvaccinated inmates at the BOP and unvaccinated staff members.

11:24AM 25   It makes it much more likely that somebody who has the physical
```

1    conditions that Mr. Mejia has is not going to be in a very good

2    position in the BOP.

3            So Mr. Pang pointed out -- or Mr. Mejia pointed out

4    to the probation officer during the probation interview, and

11:24AM  5    he's going to express this to the Court his very deep regret

6    for what he did, and what he did is what he did.

7            I disagree with Mr. Pang, and I disagree with the

8    Government's sentencing position, which appears to imply or

9    suggest or go beyond that that cryptocurrency is, per se, some

11:25AM 10    evil thing, and that most cryptocurrency people, including

11    those who didn't register with the Treasury Department, which

12    is what Mr. Mejia didn't do, are consistently, it sounds like

13    his argument is, involved in the drug activities.  That's just

14    not the case.  I mean, in this case, Mr. Mejia was operating an

11:25AM 15    unlicensed -- there's no doubt about it.  He admitted to it.

16    He did it.  He operated and he didn't register with the

17    Department of the Treasury.

18            And then for one reason or another, the Government

19    hooked him up with a confidential informant, who's probably

11:26AM 20    working off his own case so that he could have undercover

21    meetings with Mr. Mejia and bring up and propose that, to some

22    extent, the CI's activities were involved in illegal

23    activities.  And it's true, Mr. Mejia participated in those

24    conversations, but it wasn't that he was actively going out and

11:26AM 25    seeking people like the CI to help them launder drug money.

1        So the amount of the 13 million is -- the Government

2   can only infer and suggest without a shred of evidence that

3   anything more than the $250,000 that was discussed, which were,

4   you know, make-believe drug transactions with a CI, that it

11:26AM 5   must have been something more than that.  And it's not that.

6   Mr. Mejia was operating an unregistered money laundering

7   business in which he gets a small percentage as a transaction

8   for doing the thing.

9        Now, cryptocurrency, as the Court probably knows,

11:27AM 10  is -- it has problems.  And it's being looked at more by the

11  United States Government.  But on the other hand, just within

12  the last few days, it's been announced that the Staples arena,

13  where the Lakers and Clippers play, is now going to be known as

14  the Crypto.com Arena, because they sold the names to a big

11:27AM 15  crypto exchange company.

16        So this inference that the Government primarily

17  focused on in its sentencing position that makes it sound like

18  anything connected with cryptocurrency is very dark and

19  suspicious and must be involving dangerous activities is just

11:27AM 20  completely blown out of proportion, and it's blown out of

21  proportion as far as Mr. Mejia goes.

22        So another thing about the Sentencing Guidelines are

23  really out of whack here.  I mean, we negotiated it because

24  that's the way negotiations go in these cases.  And,

11:28AM 25  unfortunately, the Sentencing Guidelines link this sort of

thing to the loss table in 2B1.1.  And so what it does is it
gives the Government the opportunity to say, "Well, here's the
guidelines.  We're generously suggesting he should get the low
end of them."  But the real thing is how do the guidelines in
11:28AM this case comport with the requirement of 3553(a) about what
the ultimate sentence should be?

And here -- so here in the last week, as an example
or the comparison, we have two of the insurrectionists who
invaded the nation's Capitol in an attempt to overthrow the
11:28AM government and hang the vice president and do god knows what
other things, the mixed martial arts guy from New Jersey who
punched the police officer in the face and stole his baton and
barged in at the Capitol making threats, is sentenced to 41
months for this kind of outrageous violent activity.

11:29AM And then yesterday, the infamous QAnon Shaman, the
guy with the horns that everybody's seen with his painted face
and his flag on a dangerous long stick, who also barged into
the Capitol and sat in the Speaker's Chair, and then left
threatening notes and made other threats over his bullhorn, he
11:29AM got 41 months.  So, to me, to compare what Mr. Mejia did in a
nonviolent offense, somebody with no prior record other than
this one driving on a suspended license a long time ago, for
the Government to stand up and say, "He should get a greater
sentence than these insurrectionists who invaded the Capitol
11:30AM and tried to overthrow the government of the United States,"

1    there's something not right there.

2           Now, with regard to what the sentence should be, I

3    mean, I set it forth in much more detail, and I'm not going to

4    repeat, obviously, everything that's in the sentencing

11:30AM 5    position.  We've asked for probation.  I think I heard the

6    Court use the term "BOP" in its initial recitation of its

7    views.  And, you know, I put in there as an alternative that if

8    the Court is inclined not to go along with us on probation,

9    that what the appropriate incarceration sentence should be

11:30AM 10   despite Mr. Mejia's physical problems and the dangers that he

11   would face if he's incarcerated.

12          But, nevertheless, first of all, because the

13   Government nor Probation responded to this, I think for the

14   reasons stated legally, he is -- contrary to what Probation

11:31AM 15   says, he is legally eligible for probation.

16          And the United States Supreme Court in *Gall* has

17   talked about probation itself and strong conditions that a

18   probationer has to endure is a significant punishment.  And I

19   cited a number of cases in which the defendants engaged in what

11:31AM 20   seems to me much more serious activities than Mr. Mejia did.

21   And the guidelines didn't govern the Court's thinking in those

22   cases.  And the Court in those cases granted probation.

23          Those are the cases cited generally at the beginning

24   of page 15.  And then there are other cases in which the

11:31AM 25   defendants in this district and in others were convicted of

similar activities and they didn't get probation, but they got

much shorter sentences.  And it would seem to me if the Court

is inclined to deny our request for probation and to sentence

Mr. Mejia to some term in the BOP, I put in there as a

secondary position that we think it shouldn't be any more than

a year and a half.

But in any event, if you look at these other cases

that we cited -- *Mohammad*, *Kalra*, and *Tetley,* I think that's

beginning on page 21 -- these are cases out of this district.

I mean, *Mohammad* was basically -- *Mohammad*, *Kalra*, and *Tetley*

were basically doing the same thing that Mr. Mejia was.

*Mohammad* got 24 months, *Tetley* got I believe a year and a day.

So, you know, to warehouse Mr. Mejia for 40-something months

and -- in a world where these guys are breaking into the

Capitol, threatening to kill or hang the vice president, it

just -- there's something very wrong there.

So I think if the Court is inclined to give

Mr. Mejia some sort of incarceration sentence, that it should

be much, much lower, and it shouldn't be any more than a year

and a day.

I stand by what I said about probation.  I mean, I

don't always ask for probation.  It's very rare, as a matter of

fact.  I've had a lot of cases in this district.  But I think

in this case with all the mitigating factors, which the Court

has recognized, which we pointed out in the sentencing

```
 1  position, that it would be an appropriate sentence.
 2          Finally, as I said in the sentencing position, if
 3  somebody violates the probation, it's back to square one in
 4  terms of sentencing.  The Court can unload on them.  So I think
 5  that makes it even stronger as to why probation, in a case like
 6  this, is appropriate.
 7          And I'll be glad to answer any questions that the
 8  Court may have.
 9          THE COURT:  You've been very thorough.  I don't have
10  any questions.
11          MR. CRAIN:  Okay.  Thank you.
12          THE COURT:  Thank you.
13          Mr. Mejia, sir, you have the right to say anything
14  to me you'd like to say.  Is there something you'd like to say?
15          THE DEFENDANT:  Yeah.  If I may, Your Honor.  Can I
16  approach?
17          THE COURT:  Absolutely.
18          THE DEFENDANT:  Thank you.
19          Thank you, Your Honor, for taking the time.
20          MR. CRAIN:  Can I stand with Mr. Mejia?
21          THE COURT:  You can.  Absolutely.
22          MR. CRAIN:  Again, thank you, Your Honor, for
23  listening to my words.  I'll keep this brief.  I just prepared
24  a simple statement I'd like to make.
25          Your Honor, I am ashamed of myself for having
```

violated the law.  What I did was wrong.  I am completely

responsible and very sorry for committing these actions, these

crimes.  I wish I could undo the past, but I can't.  And I'm

very sorry.  I apologize to the Court and to my family that's

11:34AM 5   here today and the people that care about me.  I look forward

to making amends and building a new life of hard work, service,

and sobriety.  I will spend the rest of my life working to

become worthy of forgiveness.

        Your Honor, to close, I have no excuse for my

11:35AM 10  conduct.  I accept full responsibility for my actions.  In the

years ahead, I will use my story to help other people avoid my

mistakes.  I will accept my punishment with humility, and I

will never make these bad choices in my life again.

        THE COURT:  I appreciate your statements.

11:35AM 15      Mr. Pang, response, sir?

        MR. PANG:  Very briefly, Your Honor.

        As a threshold matter, I want to acknowledge that

I've heard Mr. Mejia's words.  I've read his statements.  And I

take to heart that I believe that he is genuine in his

11:35AM 20  acceptance of responsibility.

        I do want to make three very quick points in

response to Mr. Crain's comments.  To the extent that they

matter at all.  The first is Mr. Crain seems to imply that the

Government seems to believes that cryptocurrency is some kind

11:36AM 25  of dark and illegal stain on our economic system, and that's

1    just not the Government's position.

2          Cryptocurrency is no different than a casino.  Both

3    can be used for illegal purposes.  It's whether the system is

4    used for illegal purposes, that's what's at issue in this case.

11:36AM 5    And, you know, the Government has expressed the same in its

6    sentencing position; right?  In this case, it's not merely the

7    fact that Mr. Crain knew that there was instances of proceeds

8    of drug trafficking that were being laundered through his

9    unregistered business.  It's also that he never registered at

11:36AM 10   all; right?

11         The $13 million -- you know, Mr. Crain is correct,

12   the Government cannot prove that all $13 million were the

13   proceeds of drug transactions.  But, of course, that

14   $13 million loss amount doesn't just apply to Count Two of

11:37AM 15   which Mr. Crain -- or Mr. Mejia has admitted guilt to.  It also

16   applies to Count One, which is operating an unlicensed money

17   laundering -- money transmitting business.

18         And the second, you know, and I think this is

19   probably more important, is that Mr. Crain noted in his

11:37AM 20   statement to the Court that the Government basically holds

21   Mr. Mejia up by introducing a confidential source.  And but for

22   the fact that the Government introduced the confidential

23   source, Mr. Mejia would have never interacted with drug

24   traffickers, and that's just flatly inconsistent with the facts

11:37AM 25   of this case, Your Honor.

1          In fact, when Mr. Mejia talks to the confidential

2    source, he first earned his confidence by telling him,

3    "Actually, you're not the first drug trafficker I've interacted

4    with."  And after the confidential source told Mr. Mejia that

11:37AM 5    he had an international drug trafficking organization,

6    Mr. Mejia suggested setting up multiple instances of money

7    transactions over the course of several months moving forward

8    before the Government decided to intercept the business.

9          So the idea that the Government was acting as a

11:38AM 10   honeypot using a confidential source to trap an unwitting and

11   otherwise law-abiding citizen, Your Honor, is, frankly,

12   incorrect.

13          And the final matter -- the final thing I want to

14   point out in the case is Mr. Crain mentioned a couple cases

11:38AM 15   from this district involving similar conduct, involving money

16   laundering although, admittedly, all of those other cases in

17   front of Judge Selna, Judge Gutierrez, and other judges of this

18   district all involve loss amounts much less than 13- to

19   $25 million.  And in each of those cases cited by defense

11:38AM 20   counsel himself, none of those judges sentenced those

21   defendants to probation.  They were all sentenced to custodial

22   sentences.  I believe the average amount was about 24 months.

23          So, Your Honor, in sum, the Government acknowledges

24   Mr. Mejia's early acceptance of responsibility.  The very

11:39AM 25   strong and persuasive mitigating circumstances that exists in

this case.  But at its core, the Government doesn't believe

that Mr. Mejia's entitled to a 15-level downward departure, and

a custodial sentence is warranted in this case.  Thank you.

THE COURT:  Anything further, Mr. Crain?

MR. CRAIN:  Just briefly.

I think unless the Court were to hear all the

transactions and the recordings of the transactions, they

would -- there was a lot of back and forth here.  It wasn't --

I think it's been, with all due respect to Mr. Pang,

mischaracterized that he sat down with the CI and started

blabbing about -- that he was connected with drug trafficking

and could move -- help this guy in exchange of his need for

money or cash for Bitcoin or vice versa.  There's a lot of

stuff back and forth and Mr. Mejia talking about that he had

something to do with somebody who operated a smoke shop or

marijuana dispensary and various puffery on both sides and so

forth.

So I don't think that the Government's

representation is accurate, and it's not exactly the way it

went down.  And I'm -- but the Government did introduce the CI

to him.  There were conversations.  And Mr. Mejia has pleaded

guilty to what he did.

And with regard to the other cases I've described or

summarized what the facts were, the cases in this district,

and, as I said, in those cases, that's true, Judge Selna,

1    Judge Gutierrez, and the other -- I forget who the other judge

2    was, did not give probationary sentences.  Every case is

3    different but they certainly gave a much, much lesser sentence

4    than the Government is proposing here.

11:41AM 5    And so I think the most that anybody got was 24

6    months, and that was Mr. Mohammad.  And so I -- and the -- as I

7    said, there's a summary of the facts in the sentencing

8    position.  So it wasn't like any of them were much less

9    involved.  And this insinuation that seems to be drifting into

11:41AM 10   the picture here that is totally without any factual basis

11   whatsoever that, well, he was in this exchange business, so

12   there must have been -- out of this 13- to 25 million, there

13   must have been more involving drug activity.  That's unfair and

14   not supported by anything.

11:42AM 15   So unless the Court has something further from me,

16   I'll submit it.

17   THE COURT:  No.  I'm just going to the plea

18   agreement and the factual basis.  I just remember -- I thought

19   there was an acknowledgment that he knew it was -- at least

11:42AM 20   part of it was for laundered drugs.

21   MR. CRAIN:  Well, yes.  I mean, he did.  He and the

22   CI did talk about drug activity.  And the CI talked about that

23   he had customers, and Mr. Mejia talked about having clients who

24   operated the smoke shop or marijuana dispensary.  And they had

11:42AM 25   a -- they had conversations about a lot of things.

MR. PANG:  Your Honor, if I can point the Court to paragraph 18 of the Pretrial Services report in which at the last paragraph Mr. Mejia admitted to the confidential source, that he had another client who sold drugs on the dark net when discussing his money transactions business.  So not just a smoke shop as Mr. Crain seems to be implying.

Later in paragraph 19, the confidential source talks about his international business, and the CI and Mr. Mejia discussed conducting monthly exchanges of $100,000 going forward.  And it was my understanding, at least based on my review of the Pretrial Services report, that Mr. Mejia had told the Pretrial Services officer that he would stipulate to the facts of this case, but perhaps not.

MR. CRAIN:  No.  We stipulated to the factual basis and we signed the plea agreement.  I'm just saying, yes, it set forth -- my understanding of what Mr. Pang was saying earlier, it sounds like the CI came in and immediately Mr. Mejia started talking about, "Well, I'm handling the drug customers' business for them via my Bitcoin exchange."  And that's just not the way it went.  They had a number of meetings.  I think they had five of them.  And as things went on, there were a lot of talk back and forth.  Mr. Mejia said things that were legally wrong.  And they did talk about other things.

But, initially, Mr. Mejia said, "Yeah, I've got some customers who have a smoke shop."  And they got acquainted and

had various conversations.  But it wasn't like the first thing

out of the starting gate was that Mr. Mejia was saying, "Oh,

yeah, I've got all these drug customers, and I can do all kinds

of things for you" and so forth.  And the CI would keep leading

11:44AM  him along.

        And then Mr. Mejia would say things that, for all

intents and purposes, it seems like, are puffery.  Because

there's no evidence that he had anything other -- it was the CI

who was talking about, Well, I've got people from Australia who

11:45AM  deal in meth."  It's true, there was a conversation at the end

where they talked about continuing -- they could continue their

relationship.

        So, you know, that's what my interpretation of what

the Government's position was.  And I think the record should

11:45AM  be clear.  And I'm not trying to whitewash what happened or

rewrite history.  What has happened is agreed to in the plea

agreement.

        THE COURT:  And I appreciate that.  And I -- I'm

deliberately nitpicking the use of the word "puffery."  Because

11:45AM  I recall what the Presentence Investigation Report said, but

there's a general strong statement.  It's not specific, but it

says:

        "In the course of his business, defendant

    also engaged in financial transactions affecting

11:45AM    interstate commerce with the intent to conceal or

1        disguise the nature, location, source, ownership,

2        or control of the property.  And these transactions

3        involved funds that were represented and believed

4        by the defendant to be the proceeds of some form of

11:46AM  5        unlawful activity, namely drug trafficking."

6            So that doesn't -- I don't know how many of the

7    transactions.  That's unclear.  But this doesn't sound like

8    puffery to me.  And this statement is beyond the discussions

9    that Mr. Mejia had with the confidential informant.  At least

11:46AM 10    that's the way I interpret --

11            MR. CRAIN:  Well --

12            THE COURT:  -- that factual basis.

13            MR. CRAIN:  Well, I think the factual basis is the

14    factual basis.  That's what we signed in the plea agreement.

11:46AM 15    He's admitted to these two counts.  He's pleaded guilty to

16    them.  We're not disputing that in any way.  And I don't think

17    the PSR is trying to say there anything other than what the

18    elements of the crime were and what the plea agreement says.  I

19    don't think that Probation is -- when I talk about puffery, I'm

11:47AM 20    saying when people have illegal conversations or conversations

21    about illegal things.  To some extent there's truth in what

22    they say, and to the other extent, there's bragging or

23    attempting to make it look like "I'm a big guy, and I can do

24    all kinds of things, and let's keep going" and so forth.

11:47AM 25            But Mr. Mejia is operating something where he's

getting a cut from the person he exchanges the Bitcoin with,

and it's to his, obviously, illegal Bitcoin business.  It's his

advantage to have customers, and he stupidly did this.  He

admits it.  He's ashamed of it.  He regrets it.  We can't go

11:47AM  back and start the clock again or anything like that.

But he is not some danger to society.  He's not some

major player in anything.  And he operated the same -- pretty

much the same way as other defendants who, yeah, they got a BOP

sentence.  Maybe they were in perfect health, but, you know,

11:48AM  they certainly didn't get anything in this district in the

cases that we cited, like what the Government has recommended

as an appropriate sentence in this case.

THE COURT:  I appreciate that.

MR. CRAIN:  Okay.  Thank you.

11:48AM  THE COURT:  All right.  Well, after hearing from

everybody and considering the guideline range and all the

important factors and objectives of sentencing under 3553, I am

going to impose a custodial sentence of 36 months.  Three

years.  It is a variance from the guideline range, but I do

11:48AM  believe there are compelling mitigating facts and circumstances

that justify the variance down from the 57- to 71-month range.

We've talked about all those.

I do agree with the Government in this case that a

custodial sentence is necessary given the scope of the exchange

11:49AM  that was being operated illegally that involved some portion of

```
 1   laundering drug proceeds.
 2          I have the sentence from Probation recommending a
 3   sentence of 50 months with numerous terms and conditions of
 4   supervised release.  It would be my intention to modify the
 5   custodial term down to 36 months and then impose all the terms
 6   and conditions recommended by Probation.  I will give a
 7   self-surrender date to Mr. Mejia for after the holidays.
 8          MR. CRAIN:  Your Honor, can we have 60 days for that
 9   from today?
10          THE COURT:  You can have 60 days.  I might give you
11   a little more time because by the time the designation -- I'll
12   give it approximately 90 days out.
13          MR. CRAIN:  That's fine.  Thank you.
14          THE COURT:  What's 90 days, approximately?
15          THE COURTROOM DEPUTY:  February 16th.
16          THE COURT:  February 16th.
17          Is there any legal reason why I cannot now impose
18   that sentence, Mr. Pang?
19          MR. PANG:  No, Your Honor.
20          THE COURT:  Mr. Crain?
21          MR. CRAIN:  No, Your Honor.
22          I had two recommendations, also, that I'd ask the
23   Court to make.  The first one, Mr. Mejia, who, as the Court
24   pointed out, has had problems with marijuana and Xanax.  He'd
25   very much like to be in the RDAP program.
```

**UNITED STATES DISTRICT COURT**

1         THE COURT:  I will make a strong recommendation for

2  that, but I just don't want to mislead Mr. Mejia.  Usually

3  they're looking for significantly more time in custody to

4  qualify.  But I'll make the recommendation because I do believe

11:51AM 5  his involvement in this offense is due in part to his substance

6  abuse issues with marijuana and Xanax.

7         MR. CRAIN:  Mr. Mejia, who had looked into this and

8  considered the possibility of incarceration, had a particular

9  facility in mind.  But my experience has been -- I don't think

11:52AM 10  the Court is going to recommend a particular facility to the

11  BOP, but if the Court is inclined to do so, we have a name in

12  mind.

13         THE COURT:  I'll do it.

14         MR. CRAIN:  It would be the Sheridan federal prison

11:52AM 15  camp that's in Oregon.  Because we believe that the BOP in

16  California doesn't have any -- because he'll probably be in

17  some sort of a camp, I would think, unless it's a medical

18  facility.  That's up to the BOP.  But if he is in a camp,

19  apparently the California -- the BOP doesn't have any camps

11:52AM 20  that offer the RDAP program, but this federal -- Sheridan

21  federal prison camp in Oregon does.

22         THE COURT:  I'll make the recommendation.

23         MR. CRAIN:  Okay.  And then the other one is --

24  well, this may be inconsistent, but I always ask that the Court

11:53AM 25  recommend, and I cited the code authority, that the Court

1    recommend to the BOP that the person be housed -- designated

2    and housed in a facility closest to home, which, if he's in

3    Oregon, there might be other facilities such as Humboldt or

4    someplace closer to home.  But hopefully if he's not in a

11:53AM  5    medical facility, he'll be in some sort of a really low-level

6    facility like a camp.  So I guess what I'm asking is if he's

7    not assigned to the one in Oregon, that he be assigned to a

8    place closest to home.

9            THE COURT:  Okay.  I think I can do that.

11:53AM 10            MR. CRAIN:  Okay.  Thank you.

11            THE COURT:  It is ordered that the defendant, Hugo

12    Sergio Mejia, shall pay to the United States a special

13    assessment of $200, which is due immediately.  Any unpaid

14    balance shall be due during the period of imprisonment at the

11:54AM 15    rate of not less than $25 per quarter and pursuant to the

16    Bureau of Prisons' Inmate Financial Responsibility Program.

17            It is further ordered that he shall pay to the

18    United States --

19            The Government's position, is a fine needed here?

11:54AM 20            MR. PANG:  Apologize, Your Honor.

21            THE COURT:  Take your time.  I want to make sure we

22    get it right.  You didn't, in your sentencing position,

23    recommend it.  But I don't think you commented on it.

24            MR. PANG:  Your Honor, I don't think it's necessary

11:55AM 25    in this case.

THE COURT:  All right.  And so the record's clear,
he's got a negative net worth and he has maybe a total cash
flow of $105.  So I respectfully disagree with Probation that
he has the ability to pay a fine.  And given the custodial
sentence, I think just punishment is achieved with that and an
additional fine is unnecessary.  So I will take that wording
out.

The Court has entered a money and property judgment
of forfeiture against Mr. Mejia, which is hereby incorporated
by reference into this judgment and is final.

Pursuant to the Sentencing Reform Act of 1984, it is
the judgment of the Court that the defendant, Hugo Sergio
Mejia, is hereby committed on Counts One and Two of the
Information to the custody of Bureau of Prisons for a term of
36 months.  This term consists of 36 months on each of
Counts One and Two of the Information to be served
concurrently.

Upon release from imprisonment, he shall be placed
on supervised release for a term of three years.  This term
consists of three years on each of Counts One and Two of the
Information.  All such terms to run concurrently under the
following terms and conditions:

Number 1, he shall comply with the rules and
regulations of the United States Probation and Pretrial
Services office and Second Amended General Order 20-04.

Number 2, he shall refrain from any unlawful use of a controlled substance.  He shall submit to one drug test within 15 days of release from custody and at least two periodic drug tests thereafter not to exceed eight tests per month as directed by the probation officer.

Number 3, he shall participate in an outpatient substance abuse treatment and counseling program that includes urinalysis, breath and/or sweat patch testing as directed by the probation officer.  He shall abstain from using alcohol and illicit drugs and from abusing prescription medications during the period of supervision.

Number 4, as directed by the probation officer, Mr. Mejia shall pay all or part of the costs of his court-ordered treatment to the aftercare contractors during the period of community supervision.  He shall provide payment and proof of payment as directed by the probation officer.  If he has no ability to pay, no payment shall be required.

Number 5, during the period of community supervision, Mr. Mejia shall pay the special assessment in accordance with this judgment's orders pertaining to such payment.

Number 6, Mr. Mejia shall not obtain or possess any driver's license, social security number, birth certificate, passport, or any other form of identification in any name other than his true legal name, nor shall he use any name other than

his true legal name without the prior written approval or the probation officer.

Number 7, Mr. Mejia shall cooperate in the collection of a DNA sample from his person.

Number 8, he shall maintain at most one virtual currency wallet, and that one wallet shall be used for all virtual currency transactions.  He shall not obtain or open any virtual currency wallets/accounts without prior approval of the probation officer.  All virtual currency transactions along with any virtual currency wallet Extended Public Keys shall be disclosed to the probation officer upon request.

Mr. Mejia shall be limited to only using or possessing open public blockchain virtual currencies and restricted from using privacy-based blockchain virtual currencies, unless prior approval is obtained from the probation officer.

Number 9, Mr. Mejia shall comply with the Internal Revenue Service's reporting requirements as they pertain to virtual currencies and shall provide proof of having done so to the probation officer.

Number 10, Mr. Mejia shall not use any software program or device designed to hide, alter, or delete information relating to his computer use, Internet activities or files stored on his assigned computers.  This includes use of encryption, steganography, file erasing, file shredding,

secure file deletion, and cache/cookie removal software without

prior written approval from the United States Probation Office.

Number 11, Mr. Mejia shall possess and use only

those computers and computer-related devices, screen usernames,

passwords, e-mail accounts, and Internet service providers,

ISPs, social media accounts, message applications, and cloud

storage accounts that have been disclosed to the probation

officer at the commencement of supervision.  Any changes or

additions are to be disclosed to the probation officer prior to

the first use.  Computer and computer-related devices include

personal computers, Internet appliances, electronic games,

cellular telephones, digital storage media, and their

peripheral equipment, that can access or can be modified to

access the Internet, electronic bulletin boards, and other

computers.

Number 12, all computers, computer-related devices,

and their peripheral equipment used by Mr. Mejia shall be

subject to search, seizure, and computer monitoring.  This

shall not apply to items used at the employment site that are

maintained and monitored by the employer.

Number 13, Mr. Mejia shall comply with the rules and

regulations to the computer monitoring program.  He shall pay

the cost of the computer monitoring program.

Number 14, Mr. Mejia shall submit his person,

property, house, residence, vehicle, papers, computers, cell

phones, other electronic communications or data storage devices or media, e-mail accounts, social media accounts, cloud storage accounts, or other areas under his control to a search conducted by a United States probation officer or law enforcement officer.  Failure to submit to search may be grounds for revocation.  He shall warn any other occupants that the premises may be subject to search pursuant to this condition.  Any search pursuant to this condition will be conducted at a reasonable time and in a reasonable manner upon reasonable suspicion that Mr. Mejia has violated a condition of his supervision and that the areas to be searched contain evidence of this violation.

The Court authorizes the Probation and Pretrial Services Office to disclose the Presentence Report to the substance abuse treatment provider to facilitate Mr. Mejia's treatment for narcotic addiction or drug dependency.  Further redisclosure of the Presentence Report by the treatment provider is prohibited without the consent of the Court.

It is further ordered that Mr. Mejia shall surrender himself to the institution designated by the Bureau of Prisons at or before 12:00 noon on February 16th, 2022.  In the absence of such designation, he shall report on or before the same date and time to the United States Marshal located at the First Street U.S. Courthouse, 350 West First Street, Suite 3001, Los Angeles, California 90012.

1          The Court strongly recommends that BOP allow

2    Mr. Mejia to participate in the RDAP program as the Court

3    believes that his involvement in this offense was due in part

4    to his addiction to marijuana and Xanax.  The Court also

12:03PM 5    strongly recommends that BOP house Mr. Mejia at the Sheridan

6    prison camp in Oregon.  And to the extent BOP cannot do so,

7    house him in some facility in Southern California to facilitate

8    visitation from family, friends, and loved ones.

9          Mr. Mejia, I know this has been a difficult day for

12:03PM 10   you.  I just have to go over one more issue with you, and that

11   is advising you appropriately of your right to appeal.  You may

12   recall in your plea agreement, sir, you gave up the right to

13   set aside the convictions that resulted from your guilty pleas

14   as well as I believe to challenge the sentence that I just

12:03PM 15   imposed.  My review of the appellate waiver, you said as long

16   as I impose a sentence that had a term of imprisonment no more

17   than the high end of the Sentencing Guideline range, which, in

18   this case, would be 71 months, that you would not challenge the

19   sentence.  The sentence I imposed, 36 months, is significantly

12:04PM 20   less than the 71-month high end range.

21          So I believe these appellate waivers in your plea

22   agreement preclude you from being able to successfully

23   challenge the conviction or the sentence that I just imposed.

24   But if you feel these provisions are unlawful, sir, or if

12:04PM 25   there's any right in your plea agreement that you reserved and

**UNITED STATES DISTRICT COURT**

```
 1   you want to take it up with the Court above me called the
 2   Ninth Circuit, you can file what we call a Notice of Appeal
 3   with that court.
 4            A Notice of Appeal is not a difficult process.  You
 5   just ask the Clerk of the Court for the form or you ask
 6   Mr. Crain for the form, sign the form, file it, and all your
 7   rights are preserved.  However, there's a very important time
 8   limitation on filing a Notice of Appeal of 14 days.  If you
 9   wait longer, Mr. Mejia, than 14 days to file a Notice of
10   Appeal, it's going to be too late.  The Ninth Circuit won't
11   even consider it.  So if you're going to file a Notice of
12   Appeal, please do so within 14 days.
13            Do you have any questions for me about filing a
14   Notice of Appeal?
15            THE DEFENDANT:  No, Your Honor.
16            THE COURT:  All right.  Is there anything further we
17   need to discuss?
18            MR. PANG:  Not from the Government, Your Honor.
19            THE COURT:  Mr. Crain?
20            MR. CRAIN:  No, Your Honor.  Thank you.
21            THE COURT:  Thank you.
22            THE COURTROOM DEPUTY:  This Court is in recess.
23            **(Proceedings concluded at 12:05 p.m.)**
24                         **--oOo--**
25
```

12:05PM (lines 5, 10, 15, 20)

**UNITED STATES DISTRICT COURT**

1          *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES    )
                               )
4    STATE OF CALIFORNIA      )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  December 9, 2021*

16

17

18

19                              */S/ DEBBIE HINO-SPAAN*

20                              *Debbie Hino-Spaan, CSR No. 7953*
                                *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**